**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA ENERGY COMMISSION,
            *Petitioner,*

            v.

DEPARTMENT OF ENERGY,
            *Respondent,*

THE ASSOCIATION OF HOME
APPLIANCE MANUFACTURERS,
            *Respondent-Intervenor.*

No. 07-71576

DOE No.
EE-RM-PET-100

OPINION

On Petition for Review of an Order of the
Department of Energy

Argued and Submitted
November 17, 2008—San Francisco, California

Filed October 28, 2009

Before: William C. Canby, Jr. and Kim McLane Wardlaw,
Circuit Judges, and David G. Trager,* District Judge.

Opinion by Judge Canby

---

*The Honorable David G. Trager, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

## COUNSEL

Jonathan Blees, Assistant Chief Counsel, Sacramento, California, for the petitioner.

H. Thomas Byron, III, Civil Division, United States Department of Justice, Washington, D.C., for the respondent.

Charles A. Samuels, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC, Washington, D.C., for the intervenor-respondent.

S. David Hotchkiss, Assistant City Attorney, Los Angeles, California, for amicus curiae City of Los Angeles; Kristin Grenfell, San Francisco, California, for amicus curiae Natural Resources Defense Council; Arlen Orchard, Sacramento, California, for amici curiae Sacramento Municipal Utility District and California Municipal Utilities Association; Jose E. Guzman, Jr., Nossaman, Gunthner, Knox & Elliott, LLP, San Francisco, California, for amicus curiae California Water Association; Joseph M. Mattingly, Stephen R. Yurek, Arlington, Virginia, for amici curiae Gas Appliance Manufacturers Association, Inc, and Air-Conditioning and Refrigeration Institute, Inc.; and Karen L. Tachiki, Los Angeles, California, for amicus curiae Metropolitan Water District of Southern California.

## OPINION

CANBY, Circuit Judge:

The California Energy Commission ("CEC") petitions for review of an order of the U.S. Department of Energy ("DOE")

denying CEC's request for a waiver of preemption under the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6297. The CEC sought this waiver in order to establish water efficiency standards for residential clothes washers, as set forth in its state regulations, Cal. Code Regs. tit. 20, § 1605.2(p)(1). To obtain such a waiver, CEC was required to show by a preponderance of the evidence that the state regulation was "needed to meet unusual and compelling State or local . . . water interests." 42 U.S.C. § 6297(d)(1)(B). The DOE rejected the CEC's petition for three separate reasons, but asserts that "each [of these reasons] flowed from CEC's failure to provide adequate information to DOE to allow the federal agency to make an informed decision." The DOE also challenges this court's jurisdiction under the EPCA to review the denial of the waiver, raising an issue of first impression in this circuit. We hold that this court has jurisdiction under the EPCA. Because the DOE's stated justifications demonstrate an arbitrary and capricious failure meaningfully to address the CEC's application for a waiver, we reverse the DOE's ruling and remand for further proceedings.

## *Factual Background*

California is experiencing a severe water crisis, and that crisis is worsening. The need for water continues to grow, as the state's population is expected to increase greatly in the next three decades. At the same time, current water supplies are decreasing. California's surface water sources are significantly over-appropriated, and its groundwater aquifers are severely overdrafted. A variety of problems have exacerbated the water shortage, including salt water contamination and environmental degradation. California has no new significant conventional supplies available to increase the amount of water available to its citizens. It thus must pursue alternative solutions to the crisis, including efforts at water recycling, desalination, and increased water efficiency. California views improved water use efficiency as the most promising means of alleviating its water crisis.

As part of this effort, the California Legislature in 2002 required the CEC to establish water efficiency standards for residential clothes washers, which were said to account for 22 percent of the water use in a typical household. Cal. Assemb. B. 1561 (Kelley), 2002 Cal. Stat. ch. 421, § 1(b) (enacting Cal. Pub. Res. Code § 25,402(e)(1)). In response, the CEC adopted the proposed standards at issue in this case. Cal. Code Regs. tit. 20, § 1605.2(p)(1). These standards are expressed in terms of a "water factor" ("WF"), which is the ratio of the gallons of water used per load to the capacity, in cubic feet, of the washtub. *Id.* Thus a clothes washer that has 5 cubic feet of capacity and uses 50 gallons of water per load would have a WF of 10.0, while a machine of the same capacity that uses only 25 gallons per load would have a WF of 5.0. These standards would apply to both top-loading and front-loading clothes washers, and were divided into two tiers with differing times at which they were scheduled to take effect. Tier 1, initially scheduled to take effect on January 1, 2007, would require all washers (top-loading and front-loading) to perform with a WF of no greater than 8.5. Tier 2, initially scheduled to take effect on January 1, 2010, would require all washers to perform with a WF of no greater than 6.0. The CEC asserts that these standards, if implemented, would result in annual water savings equal to the City of San Diego's current water usage.

The EPCA expressly preempts state regulation of energy efficiency, energy use, or water use of any product covered by federal *energy* efficiency standards. 42 U.S.C. § 6297(b)-(d). In 2001, the DOE adopted federal energy efficiency standards for residential clothes washers, pursuant to 42 U.S.C. § 6295. 10 C.F.R. § 430.32(g). The DOE decided, however, that it did not have the authority to prescribe *water efficiency* standards for residential clothes washers. 66 Fed. Reg. 3314 (Jan. 12, 2001). Nevertheless, because the DOE regulates *energy* efficiency standards for residential clothes washers, the EPCA expressly preempted state agencies from regulating the energy *or* water efficiency of that appliance. In 2002, the CEC

adopted both energy and water efficiency standards for *com-mercial* clothes washers; this step was permissible because commercial clothes washers were not covered by any federal regulation. Cal. Code Regs. tit. 20, § 1605.3(p)(1). The California Legislature, however, also directed the CEC to adopt water efficiency standards for residential clothes washers. Recognizing that such regulation was expressly preempted by the EPCA because of the DOE's regulation of energy efficiency standards for residential clothes washers, the California Legislature required the CEC to petition the DOE for a rule waiving preemption. 2002 Cal. Stat. ch. 421 (enacting Cal. Pub. Res. Code § 25,402(e)(1)).

The CEC filed a petition for a waiver with the DOE, which was accepted as complete on December 23, 2005. The DOE denied this petition one year later, citing three reasons:

> First, CEC's proposed regulations purported to take effect on January 1, 2007, far less than the statutory three-year minimum, and CEC did not provide any information necessary to support a different effective date. Second, CEC did not meet the statutory standard, which requires a state to show unusual and compelling water interests. CEC contended that a cost-benefit analysis showed that its regulation would be preferable to non-regulatory alternatives, but CEC's petition did not support its conclusions with the underlying data that would have allowed DOE to determine whether the statutory standard was satisfied. Third, the record demonstrated that CEC's proposed regulation would make a class of washers unavailable in California, requiring denial of the waiver petition.

The CEC requested reconsideration. Following DOE's inaction for 30 days, the request was denied by operation of law on February 28, 2007. The CEC then filed its Petition for Review with this court.

### *Discussion*

We must resolve two primary issues in this appeal. First, the DOE has contested our jurisdiction, arguing that the EPCA provides for direct review in the courts of appeals only of "rule[s] prescribed under section 6293, 6294, or 6295" of Title 42, whereas the action challenged here is an order issued pursuant to 42 U.S.C. § 6297(d). *See* 42 U.S.C. § 6306(b)(1)). Second, if jurisdiction properly lies in this court, we must determine whether any of the DOE's three stated reasons for rejecting the CEC's petition can support that action under the relevant standard of review.

### 1. This Court Properly Has Jurisdiction Under the EPCA

[1] The DOE contends that the EPCA does not grant this court jurisdiction to review the denial of a preemption waiver, and that the CEC should have sought judicial review in federal district court under the Administrative Procedure Act ("APA"). Its argument is based on the following provision of the EPCA governing judicial review:

> Any person who will be adversely affected by a rule prescribed under section 6293, 6294, or 6295 of this title, may . . . file a petition with the United States court of appeals . . . for judicial review of such rule.

42 U.S.C. § 6306(b)(1). The DOE contends that the CEC is not challenging a rule adopted pursuant to §§ 6293, 6294, or 6295 but instead is challenging the denial of a waiver that was sought pursuant to § 6297(d). Accordingly, argues the DOE, we lack jurisdiction to proceed.

[2] Despite the surface plausibility of DOE's argument, we conclude that it does not effectuate the intent of Congress for the review scheme of the EPCA. It is true that review of agency action is typically located in the district courts under

the APA absent a specific statutory provision to the contrary. *Owner-Operators Indep. Drivers Ass'n v. Skinner*, 931 F.2d 582, 585 (9th Cir. 1991) ("[U]nless Congress specifically maps a judicial review path for an agency, review may be had in federal district court under its general federal question jurisdiction."). The provisions of § 6306, taken as a whole, are not consistent, however, with a view that Congress intended default jurisdiction to lie in the district courts for all review except direct challenges to rules adopted under §§ 6293, 6294, or 6295.

**[3]** The EPCA specifically confers jurisdiction on the district courts for two categories of actions under the EPCA: suits to determine state compliance with requirements of the EPCA, and suits challenging the denial of rulemaking to amend a product standard. 42 U.S.C. § 6306(c). These provisions would appear to be unnecessary if Congress intended district court jurisdiction under the APA to apply to every challenge other than direct challenges to rules adopted under §§ 6293, 6294, or 6295. It seems most likely that Congress listed one group of cases to be decided initially by the circuit courts, and another class to be decided in the first instance by the district courts. For unlisted matters, considerations of efficiency, consistency with the congressional scheme, and judicial economy may be employed to determine whether initial review in the circuit courts best accomplishes the intent of Congress. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 741-45 (1985). These considerations militate in favor of jurisdiction in this court for the present controversy.

**[4]** First, the denial of CEC's petition for a waiver of preemption is closely intertwined with the exercise of DOE's authority under § 6295. It was the statutory and regulatory adoption of residential washing machine standards for *energy* efficiency that caused the preemption of CEC's regulations. Denial of the waiver leaves the CEC preempted by the effect of the statute and subsequent DOE energy regulations. To some extent, therefore, CEC is "adversely affected by a rule

prescribed under section . . . 6295" within the meaning of § 6306(b), which confers jurisdiction on the circuit courts of appeals. "[S]tatutes authorizing review of specified agency actions should be construed to allow review of agency actions 'which are functionally similar' or 'tantamount to those specified actions.' " *Thermalkem, Inc. v. EPA*, 25 F.3d 1233, 1237 (3d Cir. 1994) (quoting *Vineland Chem. Co. v. EPA*, 810 F.2d 402, 405 (3d Cir. 1987)).

Considerations of practicality and consistency with the congressional scheme also militate in favor of review by the court of appeals. In addressing those considerations, we are aided by the decision of the Second Circuit in *NRDC v. Abraham*, 355 F.3d 179 (2d Cir. 2004) ("*NRDC 1*"), the only case addressing a similar jurisdictional issue under the EPCA. There, the court reviewed a DOE rule promulgated under section 6295, as well as related *orders* concerning the effective date of implementation of that rule. The court rejected the petitioner's argument that review of the orders belonged in the district court. The Second Circuit acknowledged that "the EPCA does also specifically provide for jurisdiction in the district court in limited circumstances," citing the two inapplicable provisions set forth in § 6306(c). *Id.* at 192 n.6. It continued by holding that, "when there *is* a specific statutory grant of jurisdiction to the court of appeals, it should be construed in favor of review by the court of appeals." *Id.* at 193.

*NRDC 1* also provided several policy reasons why jurisdiction in the court of appeals was appropriate, and those considerations apply equally here. *NRDC 1* drew a sharp distinction between "[r]ulemaking proceedings [which] do not ordinarily necessitate additional factfinding by a district court to effectuate the review process" and "the *exceptions* to review by a court of appeals found in § 6303 . . . [which] ordinarily would entail additional factfinding, as they do not reflect the culmination of a structured rulemaking process with its attendant record." *Id.* at 193-94 (emphasis added). Holding that the latter exceptions "are therefore appropriately reserved for review

by the district court," the Second Circuit based its distinction between these two types of cases on the records they would present to their respective courts. *Id.* at 194.

**[5]** It is quite clear that DOE's denial of a waiver of pre-emption falls into the category of "[r]ulemaking proceedings [which do not] necessitate additional factfinding by a district court to effectuate the review process." *Id.* at 193. Here, we are presented with a full record upon which the agency has deliberated. No further factfinding is necessary to determine whether the DOE acted arbitrarily and capriciously in reject-ing the waiver petition. We should not presume, without sup-porting evidence, that Congress would intend to implement a review system that created an entirely duplicative process whereby both the district courts and the circuit courts would review the same fully-developed record under the same legal standards.

The DOE attempts to differentiate the denial of a waiver of preemption from its normal rulemaking function. It argues that, if it were to adopt water conservation rules under § 6295, "[the] DOE must determine national standards in the broad context of the national need for . . . water conservation," but a waiver proceeding "is a much narrower inquiry, guided by different statutory factors, which are focused on state or local interests." But the decision to grant or deny a waiver certainly involves consideration of such national factors, and requires an evaluation of whether a waiver is consistent with the goals of the national scheme or frustrates those goals. We discern no qualitative difference in the two types of decisions that militates in favor of initial review of the decisions in different courts.

The case of *NRDC v. Abraham* ("*NRDC 2*"), 244 F.3d 742 (9th Cir. 2001), relied on by DOE, is inapposite. In *NRDC 2*, the court held that it lacked original jurisdiction to hear a case challenging a decision arising under the Atomic Energy Act, which did not explicitly provide for direct review in appellate

courts. The petitioner in *NRDC 2* argued that the court could assert jurisdiction under a different statute—the Nuclear Waste Policy Act—even though the challenged ruling was quite clearly issued under the Atomic Energy Act. *Id.* at 743. The court appropriately rejected this argument. In our case, however, the question is not whether resort may be had to another statute, but simply whether the EPCA provides jurisdiction in the courts of appeals. *NRDC 2* therefore does not apply.

Finally, the DOE's attempt to analogize the case of *Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279 (D.C. Cir. 2007) also fails, and there is much within that case that suggests that we should find jurisdiction in our case. In *Public Citizen*, the petitioners sought "an order prescribing a motor vehicle safety standard" under the Safety Act, but were not granted that order. *Id.* at 1287 (emphasis omitted). Like to the EPCA, the Safety Act provides that such orders, when issued, are reviewable in the first instance by the courts of appeals. 49 U.S.C. § 30161(a). However, denials of requests *to initiate proceedings* to consider orders or rules are clearly governed by 49 U.S.C. § 30,162(a)(1), which does not provide for direct appellate review. *Public Citizen*, 489 F.3d at 1287. The *Public Citizen* petition was denied at this early stage. The D.C. Circuit held that "the plain terms of the statute dictate that judicial review of NHTSA's denial of a petition for rulemaking must begin in district courts—not in courts of appeals." *Id.*

The circumstances here are quite different. We are presented with no comparable statutory command. Moreover, the same policy considerations that support our conclusion are consistent with the result in *Public Citizen*. The court in *Public Citizen* rejected jurisdiction when the agency refused to act on a petition, and thus had compiled *no record whatsoever*. Without such a record, any circuit court would find it difficult or impossible to determine whether the administrative agency had acted legally; a district court with its fact-finding capability was a more appropriate venue. In our case, however, we

are presented with a fully-developed record addressing all of the statutory requirements demanded of the CEC. The type of review required of us is qualitatively no different from the sort that we would engage in upon review of a rule promulgated under 42 U.S.C. § 6295, over which we are expressly assigned jurisdiction under the EPCA.

**[6]** For all of these reasons, we conclude that we have jurisdiction to entertain CEC's petition for review.

## 2.  The DOE's Rejection of the CEC's Petition was Arbitrary and Capricious

Our review of the DOE's administrative decision is governed by 42 U.S.C. § 6306(b)(2), which provides for review in accordance with the Administrative Procedure Act. That Act states that the reviewing court "shall . . . compel agency action unlawfully withheld [and] hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . ." 5 U.S.C. § 706(1)-(2)(A); *see Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 858 n.36 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004).

Under this standard, we will uphold an agency decision only on the basis of the reasoning articulated therein. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). We will overturn a decision as "arbitrary and capricious" when the agency (1) relied on a factor that Congress did not intend it to consider; (2) failed to consider an important factor or aspect of the problem; (3) failed to articulate a rational connection between the facts found and the conclusions made; (4) supported the decision with a rationale that runs counter to the evidence or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise; or (5) made a clear error in judgment. *Envtl. Def. Ctr. v. EPA*, 344 F.3d at 858 n.36.

The DOE gave three reasons for denying CEC's request for a waiver of preemption. We address those reasons in turn.

### a. The Three-Year Waiting Period

[7] The EPCA establishes a mandatory three-year delay between the date of the DOE's grant of a waiver and the date on which the state standard takes effect. 42 U.S.C. § 6297(d)(5)(A). The CEC's petition contained two different dates on which the requested regulations would have gone into effect: January 1, 2007, for regulations requiring an 8.5 WF ratio, and January 1, 2010, for regulations requiring a 6.0 WF ratio. Because the CEC's application for a waiver was not accepted as complete until December 23, 2005, and not ruled upon until December 28, 2006, the DOE clearly could not have issued a waiver for the first set of regulations that complied with the EPCA's three-year delay provision. If, however, the DOE had chosen to approve only the second set of regulations, their implementation would not have violated the three-year rule.

[8] There is no argument between the parties that the starting date for implementation of the first set of state regulations did not comply with the three-year rule. The dispute is over what should have been done about it. Some possible responses to the problem were: (1) rejection of the entire waiver petition, (2) rejection of the portion which would have violated the three-year waiting period, or (3) the acceptance of the waiver petition with an effective date re-drafted by the DOE *sua sponte* or by agreement with CEC.

The CEC argues that the California efficiency standards are drafted with a *nominal* effective date, which is necessary to advise the persons affected as to when enforcement is scheduled to begin under state law. Whether or not the proposed date of implementation was explicitly termed "nominal" in the CEC's initial application, California appliance regulations provide that such standards take effect only upon the effective

date of a DOE waiver. Cal. Code Regs. tit. 20, §§ 1605(b), 1065.2(p)(1). California asserts that, within the meaning of its regulation, the effective date of a DOE waiver is three years after the grant of the waiver.

The DOE maintains the position, however, that in order to meet EPCA's requirements, the CEC's petition as submitted would require that the DOE "sua sponte craft[ ] a different state regulation . . . [and] come up with its own effective date for such a regulation." The DOE claims that it lacked the power to do so because "the statute imposes a burden of proof on the state seeking a waiver of federal preemption to demonstrate that the proposed state regulation satisfies the statutory standards, and the three-year minimum lead time is an essential element of those standards." Thus, in its decision the DOE held that the CEC did not comply with the EPCA because the "CEC has provided information only in the context of the compliance dates of the California regulation, and has not provided the information necessary for DOE to promulgate a rule with an effective date that would be compliant under the EPCA, i.e., a rule with an effective date three years following the date of issuance." 71 Fed. Reg. 78,157. We find this conclusion to be both unsupported by the record and "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Envtl. Def. Ctr. v. EPA*, 344 F.3d at 858 n.36.

**[9]** The EPCA requires that a state applying for a waiver establish a compelling state need by a preponderance of the evidence. 42 U.S.C. § 6297(d)(1)(B). The DOE's rejection of underlying analysis and data provided by the CEC, without any consideration of whether this analysis would still hold force if implemented slightly later, was arbitrary and capricious. The DOE made no attempt to determine whether the analysis provided in the application would reasonably support a waiver, but instead dismissed it as part of an inflexible rule demanding a strict parity between proposed implementation dates and the research supporting the proposed standards.

**[10]** The CEC correctly argues that a rule demanding strict parity between the analysis provided and the proposed timeline would be unworkable in practice. The DOE does not generally provide a specific date by which it will have ruled upon a waiver application, and it did not do so in this case. It took DOE a year to rule on CEC's application. Because states seeking waivers cannot be prescient as to the date upon which the DOE will approve or deny a given application, some flexibility is patently necessary in order for the petitioning state to provide any analysis that is reasonably timely.

**[11]** The DOE's claim that the CEC was "obliged to demonstrate that a different effective date would satisfy EPCA's statutory criteria, or at least to provide data that would allow DOE to make such a determination" is unconvincing when the record demonstrates the DOE made no attempt to apply the data that were provided to a permissible implementation date. Because California appliance regulations provide that proposed regulations take effect only upon the effective date of a DOE waiver, it would have been reasonable to assess the sufficiency of the data provided in terms of a projected date three years after the likely date of decision on the waiver.

**[12]** Whether the data and analysis provided were sufficient ultimately to support the CEC's waiver application is a separate issue that is outside the competence of this court to determine in the first instance. The DOE argues, in effect, that it was entitled to reject the CEC's data and analysis as entirely irrelevant and inapplicable because the proposed implementation timeline could not be granted under the EPCA. This argument is contrary to the preponderance of evidence standard, as well as common sense. We therefore conclude that the DOE's wholesale rejection of the CEC's analysis on the basis that the proposed waiver could not be implemented according to its proposed timeline was arbitrary and capricious. It therefore cannot constitute a justification for the DOE's denial of CEC's waiver application.

### b. *Unusual and Compelling Interests*

The DOE's second ground for its denial of the CEC's waiver petition was that "[the] CEC ha[d] not established by a preponderance of the evidence that the State of California has unusual and compelling water interests" as required by the EPCA. To satisfy this standard, the CEC was required to demonstrate that California has interests in saving water that "are substantially different in nature or magnitude than those prevailing in the United States generally" and "are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production . . . ." 42 U.S.C. § 6297 (d)(1)(C)(i)-(ii). The DOE did find that CEC had met the first requirement; i.e., it found that California's water interests are "substantially different . . . in magnitude than those prevailing in the U.S. generally," because the State "has a volumetric total demand far greater than the national average, . . . a projected population increase that is above the median growth rate, . . . [and] higher than average water rates." 71 Fed. Reg. 78,162. The DOE found, however, that the CEC had not satisfied the second requirement—namely, that its standards were "preferable or necessary when measured against alternative approaches." *Id.* 78,163.

The DOE's explanation for this finding was that the CEC had failed to provide underlying analysis of its assumptions and data inputs and that, as a consequence, DOE was "unable to determine that the California Petition meets EPCA requirements." *Id.* According to the DOE, the CEC merely asserted that "the economic assumptions and data inputs used in this analysis were vigorously tested in [the CEC's] public rule-making process that led to the adoption of this standard" and did not indicate where in that record the requisite analysis could be found. *Id.*

We find the DOE's conclusions unsupported by the record. The CEC provided "a full explanation of its assumptions, data, and analyses" in the form of its own rulemaking record. The DOE itself, in its notice soliciting comment, referred readers to the web site at which CEC's rulemaking record could be found. 71 Fed. Reg. 6023 (Feb. 6, 2006). This record contained a study commissioned by California Pacific Gas & Electric ("PG&E") which provided much of the analysis used in the CEC rulemaking, including a first cost analysis which the DOE claimed did not exist in the CEC's petition. Morever, CEC correctly points out that it cited the PG&E study as support for its conclusions in its petition for reconsideration to the DOE.

It is also worth noting that the DOE's own regulations require that it accept as complete "[o]nly such petitions which conform to the requirements of [DOE's regulations] and which contain sufficient information for the purposes of a substantive decision . . . ." 10 C.F.R. § 430.42(f)(1). The DOE's acceptance of the petition as complete casts some doubt on its later faulting of CEC's reliance on the CEC rulemaking proceeding.

**[13]** We conclude, therefore, that the CEC provided sufficient data and analysis for the DOE to make a decision concerning whether California's standards were preferable or necessary compared to alternatives. Whether those data and analysis were sufficient to meet CEC's burden is not for this court to decide in the first instance. It is clear, however, that whether or not the data and analysis were sufficient, the DOE simply did not evaluate them. Thus, at the very minimum, the DOE failed to consider an important factor or aspect of the problem. The DOE's reliance on its second ground for denying CEC's petition for waiver was, therefore, arbitrary and capricious.

#### c.    *The Unavailability of Top-Loading Washers*

The DOE's third and final basis for rejecting the CEC's waiver petition was its finding that opponents of the proposed

regulation had demonstrated that the 6.0 WF standard for top-loading washers "would likely result in the unavailability of top-loading residential clothes washers in California." 71 Fed. Reg. 78,168. Therefore, the DOE concluded, it was precluded from granting the waiver by § 6297(d)(4), which mandates denial of a waiver if "interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), *features*, sizes, capacities, and volumes that are substantially the same as those generally available in the state at the time of the [DOE's] finding . . . ." 42 U.S.C. § 6297(d)(4) (emphasis added). The DOE based this conclusion on the ground that commenters had established that "there are no top-loading residential clothes washer[s] in the current market that would comply with the 6.0 WF level of the proposed California regulation." 71 Fed. Reg. 78,167.

It is uncontested that, at the time that the CEC filed its waiver application, no top-loading washers existed that would meet the 6.0 WF standards; the most efficient top-loading washing machine on the market had a WF of 6.3. The CEC argues, however, that the fact that the market in 2006 has no better top-loader than a 6.3 WF model does not support the DOE's conclusion that the market is unlikely to have 6.0 WF top-loaders in 2010.

**[14]** The efficiency standards of existing residential washing machines are undoubtedly relevant to the capabilities of such machines to comply with a 6.0 WF in the future, and thus we do not subscribe to the CEC's sweeping argument that there was no "rational connection between the facts found and the conclusions made." *Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 858 n.36 (9th Cir. 2003). But to deny a waiver on this final ground, the DOE was required to find that "interested persons have established, by a *preponderance of the evidence*, that the State regulation is likely to result in the unavailability [of top-loading washers]." 42 U.S.C. § 6297(d)(4) (emphasis

added). To determine whether the interested parties had satisfied the standard of preponderance of the evidence, it was necessary for the DOE to weigh the commenters' evidence of future availability of top-loaders against that offered by the CEC. The DOE's finding cannot be sustained on the strength of its citation only of the commenters' evidence with reference to present capabilities. Of course, the DOE may use its own expertise to predict that, on the basis of its previous experience and current trends, the relevant industry could not achieve the requisite 5% increase in efficiency over the next three years. No such analysis appears in the DOE's order, however. The CEC provided testimony in the DOE's record in which PG&E stated that it was unlikely that there will be "any limitations in features, sizes, capacities, or volumes that would result even after the implementation of the 6.0 water factor [standard]." The DOE *now* dismisses this testimony as a conclusionary prediction by an insufficiently expert body, but its order did not address this evidence. The DOE's failure to address CEC's evidence of the probable capability of top-loaders in the future constitutes "a clear error of judgment," and thus this basis for the DOE's ruling cannot stand. *Envtl. Def. Ctr.*, 344 F.3d at 858 n.36.[1]

## 3. The Proper Form of Relief

[15] The CEC has requested that this Court order the DOE to grant the CEC's waiver petition. However, this Court's appropriate role is not to engage in the underlying analysis to determine whether the statutory criteria are met, even if the CEC might have supplied the DOE with sufficient information to do so. We are "not generally empowered to conduct a

---

[1]The parties also contest whether the DOE was empowered or compelled to grant the three additional WF standards requested by the CEC which would not have eliminated a feature of residential clothes washers from the market; namely, the 6.0 WF standard for front-loading washers and the 8.5 WF standard for both front- and top-loading washers. Because we are reversing the order of the DOE, we find it unnecessary to address this issue.

*de novo* inquiry into the matter being reviewed and to reach [our] own conclusions based on such an inquiry." *Lorion*, 470 U.S. at 744 (citing *FCC v. ITT World Commc'ns., Inc.*, 466 U.S. 463 (1984)). Considering the significant number of issues left for resolution, many of which require factual findings in the DOE's area of expertise, we decline to order a waiver on the present record. We reverse the challenged order of the DOE and remand for further proceedings consistent with this opinion.

**PETITION FOR REVIEW GRANTED; REVERSED AND REMANDED.**